OPINION OF THE COURT
Susan R. Larabee, J.
An order of fact-finding dated March 14, 2013 having been entered in this court adjudging that the respondent herein committed the following acts: manslaughter in the second degree in violation of Penal Law § 125.15 and menacing in the third degree in violation of Penal Law § 120.15;
And notice having been duly given to respondent, presentment agency and respondent’s parent/person legally responsible for the respondent’s care pursuant to section 341.2 of the Family Court Act;
And the matter having thereafter duly come on for a dispositional hearing pursuant to section 350.2 of the Family Court Act on March 14, 2013, April 9, 2013, April 18, 2013, May 2, 2013, May 8, 2013, May 15, 2013, May 16, 2013, May 21, 2013, May 22, 2013, May 28, 2013, May 29, 2013, June 4, 2013, June 5, 2013, June 12, 2013, June 27, 2013, July 9, 2013, July 15, 2013, and July 17, 2013; and,
The court, after making an examination and inquiry into the facts and circumstances of the case and after having reviewed and made available various reports in accordance with section 351.1 of the Family Court Act; and
The court having also considered the testimony of 10 witnesses and the parties’ summations, makes the following findings and orders:
*480 Respondent, Desteny D., is a 13-year-old female who appears before this court with two felony findings entered against her within a one-year period of time.[1] On January 18, 2013, the Honorable Sidney Gribetz presiding in Bronx Family Court entered a finding, after trial, against respondent under docket number D-032057-12. Respondent was found to have committed acts of assault in the second degree, criminal possession of a weapon and menacing in the second degree for intentionally burning the 13-year-old victim, Eric R, with a flat iron. The victim sustained severe burns requiring medical attention and surgery, with permanent scars. Respondent’s delinquent acts, which gave rise to the Bronx Court’s finding, occurred on December 7, 2012, while she was paroled under the instant docket to an alternative to detention program, and in the care of her mother, Maria Perez.[2]
On March 14, 2013, after an extensive trial, this court, by order of fact-finding, adjudged that the respondent committed acts of manslaughter in the second degree and menacing in the third degree. This court found that the respondent recklessly caused the death of 15-year-old Justin S. by intentionally pushing him into the East River where he met his death, by drowning. As Dr. Emily Aron, clinical psychiatrist, concluded, “the findings in both [proceedings] . . . involve physical cruelty to people, as well as threats or use of a weapon that can cause serious physical harm.”[3]
Throughout the pendency of both matters, while on parole and in detention, respondent and her mother were interviewed by numerous individuals including psychiatrists, psychologists, social workers and New York City investigating probation officers. The interviews with respondent, her mother and collateral sources were extensive, and were presented to the court during this dispositional hearing in the form of documents, reports, evaluations, assessments and testimony. In reviewing all relevant factors, this court does not discount that the respondent’s life has been marked by two difficult events in the summer of 2011: the loss of her sister, as well as learning, for the first time, that she was adopted. Ms. Perez is actually her maternal *481 great-aunt. Desteny, despite this, refers to Ms. Perez as her mother, and this court does as well. However, the unfortunate fact that respondent’s early life has been marked with incidents of trauma and periods of inappropriate caretaking by her mother, and that some of her problems may stem from situations beyond her control, does not relieve this court of its obligation to enter a dispositional order that meets the needs and best interest of the respondent while protecting the community.
Accordingly, the court, having carefully considered and reviewed all relevant evidence at disposition, concludes that the respondent requires supervision, treatment and confinement and that she must be adjudicated a juvenile delinquent.
Three members of the New York City (NYC) Probation Department testified, including Branch Director Frost, Supervising Probation Officer (SPO) Dent, and Investigating Probation Officer (PO) Pearson. Of the three, two recommended placement of the respondent, which was overruled by Director Frost.[4] It must be noted that Ms. Frost never interviewed any of those involved in this matter, including the respondent, her mother, school teachers, administrators, or the victim’s surviving family members. Additionally, Ms. Frost only reviewed a select number of documents in relation to this respondent, and did not consult PO Pearson, who was the only member of the Probation Department to actually interview anyone. She did not investigate the case in any way prior to the final recommendations being presented.
Ms. Frost was unclear and evasive about her involvement in this matter, and, in fact, had consulted with the deputy commissioner of probation in the hours before the final investigation and report was due. Although she claimed that such consultations are routine in “media” cases, she testified that she was unaware of any mention of this case in print or other media at the time.[5] In early April, when the probation report was finalized, Justin S. had been dead for nearly a year. Aside from “media” cases, Ms. Frost also testified that it was a standard *482 operating procedure to consult with the deputy commissioner of probation for a determination when other counties made differing recommendations or if she disagreed with an SPO and investigating PO’s unified recommendation. However, Ms. Frost testified that neither SPO Dent nor PO Pearson were present during this meeting nor did she conference this matter with either of these staff members during that meeting or at any time prior to her changing the Department of Probation’s initial recommendation, determined by PO Pearson and approved by SPO Dent.[6]
Again, without consultation, Ms. Frost deleted much of the material in PO Pearson’s draft of the investigation and report, especially portions regarding the felony assault in the Bronx. PO Pearson’s draft of the investigation and report is in evidence.[7] In the end, the official Probation recommendation, as written in the investigation and report, is an alternative to placement (ATP), conditioned upon “placement in a residential or in a diagnostic facility for more observations and comprehensive assessment . . . [the results of which] are to be forwarded to the Court so their findings can be incorporated in the ATP service plan.” It should be noted that during Ms. Frost’s testimony she, once again, unilaterally changed the Probation Department’s recommendation to ATI] without conditions. The court finds that Ms. Frost was not fully candid or credible.[8]
The court finds that PO Pearson was candid and credible. In the investigation and report draft, PO Pearson recommended placement as being the only way for the respondent to get adequate mental health treatment and to protect the community from the respondent until such treatment had been effective. Her recommendation was based on a thorough review of the Manhattan and Bronx cases, the Probation files, the detective’s statements and reports, and interviews with respondent, her mother, Justin S.’s father, the Bronx victim and his mother, as *483 well as multiple collateral sources, such as respondent’s teachers. During her testimony, PO Pearson demonstrated a clear understanding of the underlying findings, respondent’s severe mental health needs and lying pathology, her history of being verbally and physically aggressive, her negative peer relations, as well as her continued truancy and delinquency while in the care of her mother. This court finds that PO Pearson’s recommendation is well reasoned and based on a measured, studied review of this complex matter. Although admitted over respondent’s counsel’s repeated objections, the court considers the facts of the Bronx case primarily and does not rely on the victim impact statement obtained in relation to that case.
As to Supervising PO Dent, the court finds that her testimony was variable, and that she appeared to be under great stress. She did testify that when an investigating probation officer’s recommendation is not being finalized, it is standard procedure to conference the case for discussion. There was no such conference here.
As to the formulas, grids and check-off boxes whose mandated use is statutory, this court finds that, while they may be useful in some cases, relying upon them in this instance is inappropriate and would result in an extreme disservice to the respondent and to the citizens of New York. The determination of how many “points” are assigned to a respondent is, in this case, flawed and overly subjective in that behavior which is clearly “callous” in commonly-understood parlance, is not recognized as such by the Department of Probation. Probation’s Youth Level of Service/Case Management Inventory (YLS), submitted and based on its final investigation and report recommendation, assigned respondent “21-points,” which indicates that she is a “moderate risk.”[9] In this court’s opinion, the actual number of points should be significantly higher than the tally *484 submitted by Ms. Frost in the YLS.[10] The record clearly reflects that respondent’s failure to comply with terms of her parole was ignored, as were her curfew violations, and other behaviors, including having committed a serious assault during the pendency of this matter, her prior use of marijuana and negative peer relations.
Additionally, there are no “points” assigned which would take into account her record of delinquency because she has “only” two findings. According to the manual for this system of evaluation, which covers juveniles between ages 12 and 19, only if there are three prior convictions is this considered a “risk factor.” Particularly in this case, to hew mechanistically to YLS would be illogical: before respondent attained her 13th birthday, she had already killed one boy and seriously burned another. After receiving in evidence and giving the YLS/SDM due consideration, this court declines reliance upon the Department of Probation’s “validated risk assessment.”[11] Not every respondent can fit neatly into a grid or force-choice check-off form, and this respondent clearly does not.
The court finds that both clinicians, Dr. Darielle Watts-Jones and Dr. Emily Aron, have been fully candid and credible. Their conclusions and recommendations were supported by the facts and by their professional experience. The psychologist who prepared the mental health study from the Bronx Family Court, Dr. Watts-Jones, and whose report is in evidence, testified completely credibly, clearly and professionally. She explained that although she originally believed that it would be possible for respondent to be maintained in the community, her opinion changed when she learned that the trial in the instant matter concluded with respondent’s being found guilty of manslaughter in the second degree. She also agreed with the conclusions of Dr. Emily Aron, the psychiatrist who examined respondent and her mother subsequent to her own report. Both Dr. Watts-Jones and Dr. Aron firmly stated that respondent could already have or might develop psychotic behaviors and features, and that a substantial period of observation and diagnostic evaluation is necessary to ensure that this potentially deadly “trajectory” is *485 interrupted before any more time passes. They are equally firm in their uniform opinion that the risk to others posed by this respondent is so high and her behavior is so demonstrably aggressive and cruel that her remaining in the community is not appropriate.
Dr. Christina Eggermont, who performs assessments for New York Foundling and its numerous programs run in cooperation with the Administration for Children’s Services and for the Juvenile Justice Initiative (JJI), was a credible, if limited, witness. She testified that she interviewed the respondent and her mother, and that they could benefit from the family functional therapy (FFT) program run by one or another of the New York Foundling/JJI manifestations. She further testified that she does not provide any therapy or other services to respondents, although she is available to consult with New York Foundling/ JJI personnel. She had read two investigation and reports and mental health studies — from the Bronx and Manhattan. She was not fully “informed” about the nature of the findings, the facts of the case, or respondent’s actions in burning Eric E and killing Justin S. She too found Desteny not to be truthful.
Several alternative to placement programs reviewed the respondent’s case. Initially, none, including JJI, accepted her.[12] Later, respondent’s exhibit C was received stating that JJI had decided to accept the case into their family functional therapy program.[13] Two witnesses from this program were scheduled to testify for respondent, but were not called.
The community program finally requested by respondent’s counsel is “MST-Fsych.” Lisa Fein, the director of that program, was seriously under-informed. Erior to accepting respondent into her program, Ms. Fein had never interviewed respondent, her mother, or anyone else and failed to read the complete files in the homicide case, or even this court’s written decision. She seemed not to know that the Bronx case had already gone to trial, and that respondent had been found to have deliberately burned the victim at least twice, and then pulled on his burned skin in a mocking fashion. This court finds that she was not fully candid in her statement about the referral of this matter *486 for consideration. Although she was not on the respondent’s witness list as recently as June 4th, she testified that she received the referral from one of her supervisors only on June 6th, and had decided to accept the respondent’s case on June 7th. Ms. Fein testified that she did not write the first, and rather significant, paragraph of her unsigned letter of acceptance, which is in evidence.[14] In fact, she testified that the paragraph was inserted into her letter of acceptance after she submitted it to her supervisor. She testified that she had no knowledge as to when, or by whom, the paragraph was written.
This court finds that Ms. Fein has grossly and substantially failed to appreciate the danger posed by the respondent to others, or the deep-seated, serious mental health problems of respondent and her mother. Although perhaps valuable for respondents with less complicated cases, the program and services Ms. Fein described would be inadequate in this instance. The description of her program would neither serve the best interests of the respondent nor in any way protect the community from her actions.[15]
*487 Ms. Jacqueline Sherman, associate commissioner for the Office of Youth and Family Justice for the Administration for Children’s Services, in charge of non-secure placement facilities in New York City, testified as to the general nature of these group homes, the specialized group homes, those functions and programs which can be offered on-site, and those like schools, which are off-site. Ms. Sherman testified that a respondent’s placement in a particular facility is based primarily on the youth’s age, education level, developmental level and geography. She testified that neither the court’s finding nor the mental health needs of the youth are “heavily considered” when placing a respondent in these completely non-secure facilities.[16]
Although there has been a waiver granted by the State to lock some of the exit doors, at least two such doors have time-delay locks, which open after 15 seconds. Windows are alarmed, but not locked. Counsel appeared with the witness, and objected to questions about AWOLs and rearrests, perhaps in light of a recent Family Court decision about arrests of juveniles while AWOL from facilities.[17] Her objections were overruled, and the evidence, although approximate, was that, in the 10 months since the program became operational, 700 warrants were issued with 120 rearrests while respondents were AWOL. There were only 8 to 10 requests for upward modification to a more secure placement. For all the reasons and analysis of all the evidence, as stated above, this court finds that the lack of 24-hour supervision, treatment and security available in a New York City ACS non-secure “Close to Home” placement, even if a six-month minimum were to be ordered, would not be in this respondent’s best interests nor would it in any way protect the community.[18]
The court finds that all of the community-based dispositions proposed by respondent, including placement in a non-secure group home in New York City’s ACS “Close to Home” program, *488 fail to take into account respondent’s serious and untreated mental health needs, as well as the severe lack of adequate supervision provided by respondent’s mother. The record is replete with contradictory accounts as to whether there is any supervision at all. Inexplicably, Ms. Perez chose Mother’s Day weekend to go away and let respondent, then just under two weeks beyond her 12th birthday, spend the weekend with her 15-year-old boyfriend, whose parents Ms. Perez did not know. It was during that weekend when Desteny killed Justin S. The proposed “less restrictive alternatives” are inconsistent with the particularized needs and best interests of this respondent and will not provide protection to the community.
Ms. Perez claimed to have been at home when respondent’s next victim was burned in their apartment. In discussing this incident with the Probation Officer, Ms. Perez expressed disbelief that the burning occurred. Similarly, she denied that her daughter was responsible for Justin’s death, or “the Justin problem,” as she refers to it. Although she and respondent claim in the reports to have a close relationship, both school and detention staff have noted respondent screaming at her mother and otherwise being extremely disrespectful to her. At one point, during the pendency of this proceeding, Desteny claimed to her Legal Aid social worker that her mother had punched or hit her, resulting in the social worker reporting the incident to the Statewide Central Register of Child Abuse and Maltreatment. Desteny later denied to the investigator that the incident occurred.[19] Desteny’s apparent lie with regards to this important issue is significant in assessing the ambiguous nature of the familial relationship.
Respondent claimed that she can tell her mother “anything,” including that she was having sex with her 15-year-old boyfriend, and yet Ms. Perez claims to have heard about Justin S.’s death either on social media or only when Detective Cruz came to their apartment. Respondent admitted to at least once spending the night with her boyfriend while telling her mother she was with a girlfriend.
*489 There is no dispute that Ms. Perez is suffering from mental illness. She describes herself as missing the first probation interview because she “had a nervous breakdown” and took medication which caused her to sleep through the appointment. All of the witnesses find her to be depressed and overwhelmed. She herself admitted that she neglected Desteny. Despite the fact that this case has been in court for slightly over one year, there is no evidence that Ms. Perez has yet obtained any mental health treatment whatsoever — despite the fact that there appears to be a family history of mental illness, with one uncle having been described as living in the “crazy house” until his death under unknown circumstances. Although not within this court’s jurisdiction to so order, Ms. Perez is strongly urged to seek mental health counseling for herself without further delay. This therapy can continue with Desteny using whatever treatment “modality” is deemed most appropriate when she is sent home with aftercare supervision.
The court further finds that neither community alternatives to placement nor placement in an ACS “Close to Home” non-secure facility are appropriate because such programs and facilities have been tried before, and have neither prevented re-offense nor demonstrated respondent’s amenability to any kind of non-placement supervision. Respondent was paroled on the New York County matter to an alternative to detention program. She did not cooperate with the conditions of parole, including school attendance and program attendance. Even considering the 11th hour submission by respondent, handed to the court only when summations were called to begin, only a handful of non-appearances seem to be excused, and those all concerned meetings with her attorney or a Legal-Aid-referred psychologist.[20] It was during this unsuccessful period of parole that respondent committed what would be a second-degree assault.
After being remanded to non-secure detention by the Bronx Family Court, Desteny’s behavior in the group home was assaultive, angry and disruptive, as amply documented in the adjustment reports.[21] When in secure detention, her erratic, provocative and assaultive behavior continued and remains, despite constant attempts at counseling.
*490 Ms. Jewel Cheeseboro, a court liaison from the New York State Office of Children and Family Services (OCFS) testified as to the availability of limited secure placements for New York State female juvenile delinquents. There is only one such facility, and it is located at a significant distance from New York City. It is small, with only 23 beds total, 10 of which are in a separately-run mental health unit, staffed and managed by the New York State Office of Mental Hygiene. It is far more structured than a non-secure group home, features more supervision and hardware and less freedom of movement. Distance obviously makes it more difficult for in-person visits and consultations, but the facility offers videoconferencing for parents and family members. Psychiatric, psychological and social worker services are available on a 24-hour basis, although it was not clear whether all staff are full-time. Treatment is on site, as is education, counseling and other necessary services.
The most professionally competent and relevant testimony which considered the dual mandates of the Family Court Act was that of the two mental health clinicians, Dr. Watts-Jones and Dr. Aron. As alluded to previously, each found that the respondent presents such a high risk of aggression and danger to the community that, when coupled with her complex and highly troubling diagnosis and potential diagnoses, she requires placement in a very structured facility. As Dr. Aron concluded,
“given the severely aggressive nature and serious consequences of the behavior that has led to the two findings, Desteny’s lack of insight, her impaired capacity for empathy, the difficulty she has in taking responsibility for her actions in both incidents, and a pattern of other antisocial activities and attitudes, she is of significant risk for future aggression and dysfunction unless intensive services are provided.”[22]
The court finally considers the very sad and heartfelt testimony of Justin S.’s father, Jayson S., and the letter from his mother, Elizabeth S. Their son is gone forever, but respondent’s confession to them at least has relieved their fear that he may have killed himself. They do not appear in any way to be vengeful or to harbor any ill will toward the respondent. They do not understand why she killed their son. They, their children, and other members of their family and community are grieving and will, no doubt, do so forever.
*491 To answer the question of why respondent killed Justin S. and burned Eric P, attacks peers, steals, eats matches and jewels, lies pathologically, makes odd and inappropriate comments, “hates boys,” and so on, is critical. To prevent her from seriously injuring others, or worse, is critical. To treat her mental illness and behavioral problems is critical. To return her to a healthy and functional home is critical. To find a way for her to lead a normal life is critical.
The only way to do this is to place respondent for 18 months in a limited secure facility operated by the New York State Office of Children and Family Services, with a six-month minimum period. During this period, the recommendations of Dr. Aron and Dr. Watts-Jones should be followed. The separate mental health unit at the OCFS facility is ideally suited to the intensive observation, diagnosis and formulation of the particularized treatment plan required for respondent. There is a current individual education program which should also be utilized once she is in placement. When a more precise diagnosis is arrived at, appropriate treatment can be implemented at once.
It is most definitely not in this respondent’s best interest to receive any credit for time in detention. Previous examples in the exhibits and in this decision reinforce this. Six months is the “maximum minimum” permitted by statute. Similarly, 18 months is the maximum initial period of placement permitted by statute. For this respondent, for whom very long-term treatment will likely be necessary, this placement period would be woefully inadequate if over seven months were to be credited. At the same time, her home situation is seriously inadequate. Her mother is in need of immediate mental health services, which will also require some time to become effective and hopefully enable her to deal with her own problems and Desteny’s complex set of needs and challenges.
Accordingly, this court finds that placement with OCFS for a period of 18 months, with a six-month minimum period and no credit for time in detention is, given the seriousness of this case, the least restrictive alternative that is consistent with the respondent’s severe mental health needs and best interests, while protecting the community.

. Respondent was born on April 29, 2000. At the time of the initial incident in May of 2012, respondent had recently turned 12. During the pendency of these matters the respondent turned 13.

. On or about December 9, 2012, respondent was remanded to detention.

. Court’s exhibit 5, psychiatric report by Dr. Emily Aron, dated Apr. 9, 2013 New York, received Apr. 9, 2013.

. The court and all parties throughout the proceeding refer to the initial recommendation of placement made by PO Pearson, and approved by SPO Dent, as the investigation and report “draft.”

. Ms. Frost’s testimony regarding this “meeting” with the deputy commissioner of probation was unclear and inconsistent. The documents she testified to reviewing prior to changing PO Pearson’s recommendation varied throughout her testimony. Ms. Frost admitted that she did not bring the entire Probation file regarding this matter to the deputy commissioner’s attention at this meeting.

. Ms. Dent testified that it is her directive that investigating POs retain copies of all drafts and documents until a case is completed. Ms. Frost had the file in her possession during her testimony. Upon request, Ms. Frost was asked to produce numerous documents from Probation’s file and emails, with attachments, that were allegedly exchanged during this “meeting.” Ms. Frost testified that the documents were “missing” from the file. Counsel from Probation was present during the testimony of the three NYC Probation witnesses and reported to the court that Probation was unable to locate the emails and attachments.

. Court’s exhibit 10, New York City Probation Department Investigation and Report, PO Pearson’s draft, received May 15, 2013.

. Testimony of Frost, May 28, 2013, May 29, 2013, June 5, 2013.

. Under the YLS, all points are equal, regardless of the severity of the situation or case. If a respondent is assigned 0 to 8 points, her total risk/need level is determined to be “low”; 9 to 22 points she is determined to have a “moderate” risk/need; 23 to 34 and 35 to 42 points, she is determined to have a “high” or “very high” risk/need. The Structured Decision Making Matrix (SDM) then utilizes the risk/need level and the respondent’s finding to determine, generally, two possible Probation recommendations. The SDM grid used by the Probation Department states that it is mandatory to “consider the circumstances of the particular case.”

. The court notes that increasing respondent’s YLS score by two points would, according to the SDM, require Probation to make a determination of “Out of Home Placement or Alternative to Placement.” Under the final YLS submitted, the SDM required Probation to make a determination of alternative to placement or enhanced supervision program (level 3 probation).

. Family Ct Act § 352.2 (2) (f).

. Court’s exhibit 9, New York City Probation Department, exploration of alternatives summary sheet, dated Apr. 18, 2013, received May 2, 2013.

. Respondent’s exhibit C, Juvenile Justice Initiative of the Administration for Children’s Services, Blue Sky Continuum of New York Foundling acceptance letter into the functional family therapy modality by Chava White, LMSW (unsigned), dated May 16, 2013, received May 16, 2013.

. Compare respondent’s exhibit D, updated Juvenile Justice Initiative of the Administration for Children’s Services (ACS), Blue Sky Continuum of New York Foundling acceptance letter into multisystemic therapy psychiatric program (MST-Psych), dated June 7, 2013, received June 12, 2013, with respondent’s exhibit C, JJI/ACS/Blue Sky original acceptance letter to FFT. The court notes that the initial paragraph of Ms. Fein’s letter gives JJI/New York Foundling and MST-Psych “final decision making authority” to place respondent in any program within the JJI/New York Foundling continuum without consultation of any party or the court. Despite this alleged continuum, Ms. Fein testified that she did not consult with any JJI/New York Foundling personnel, psychiatrists or psychologists to determine if her program or the continuum of programs offered by JJI/New York Foundling would met this respondent’s needs. In fact, she testified that MST-Psych was a very distinct and separate program from FFT.

. This court notes that MST-Psych intended to assign Mr. Kai McBride to this respondent, despite Desteny’s repeated statements that she “hates boys.” At the conclusion of counsels’ closing arguments on July 17, 2013, the court reserved decision. While selecting a date to issue the decision, counsel for respondent stated “for the record, Kai McBride is a female therapist from New York Foundling. JJI was just reporting it behind me . . . There’s no information as to Kai’s gender on the record.” (July 17, 2013 tr at 46-47.) This court finds that Ms. Fein did, in fact, testify that Mr. Kai McBride would be assigned to Desteny and, throughout her testimony, Ms. Fein, counsel for respondent, the presentment agency and this court referred to the proposed MST-Psych therapist, trained in family and marriage counseling, as “Mr.” McBride and “he.” No application was made to this court to amend the transcript or recall Ms. Fein to clarify the gender of her employee. (Testimony of Fein, June 12, 2013, June 27, 2013.)

. Testimony of Ms. Sherman, July 15, 2013.

. Matter of Arnold P., 39 Misc 3d 1219(A), 2013 NY Slip Op 50669(U) (Fam Ct, Queens County, Apr. 30, 2013).

. In this court’s original decision, it noted that the Family Court Act, as recently amended, did not permit minimum periods of placement in non-secure facilities such as ACS “Close to Home.” Family Court Act § 353.3 (9) does, in fact, permit a six-month minimum residential placement for all “Close to Home” placements where the offense committed was a felony. There are, in fact, two sections 9 of Family Court Act § 353.3, one effective until March 31, 2018, and one effective as of March 31, 2018. This court referenced the section 9 that is not in effect until March 31, 2018.

. Respondent’s mother reported to investigators and the mental health clinician ACS’ involvement with her family. Although the oral transmittal report (intake report) was not submitted in evidence because the matter was “unsubstantiated” due to Desteny’s retraction of her statement that her mother punched her, an ACS case supervisor reported and confirmed to PO Pearson the contents of the intake report. ACS also confirmed with PO Pearson and the mental health clinician that on March 5, 2012 an educational neglect case against Ms. Perez was “substantiated.”

. Respondent’s exhibit I, CASES letter, dated July 17, 2013, received July 17, 2013.

. Court’s exhibit 3, adjustment reports, received Mar. 25, 2013, Apr. 9, 2013, May 2, 2013, May 8, 2013, May 15, 2013, May 16, 2013, May 22, 2013, May 28, 2013, May 29, 2013, June 4, 2013, June 5, 2013, June 27, 2013, July 9, 2013, July 15, 2013.

. Court’s exhibit 5, psychiatric report by Dr. Emily Aron, dated Apr. 9, 2013, received Apr. 9, 2013.